UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISON

| | |
|---|---|
| HBM INTERESTS, LLC, ET AL | CIVIL ACTION NO. 12-1048 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CHESAPEAKE LOUISIANA, LP, ET AL | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Partial Summary Judgment (Record Document 18) filed on behalf of the Defendants Chesapeake Louisiana, L.P. ("Chesapeake"), and PXP Louisiana, L.L.C. ("PXP"). The Defendants seek dismissal of all "claims based on allegations of the Complaint which contend and allege that Chesapeake and PXP are improperly charging Plaintiffs' royalty share of production a portion of post-production costs, and that Chesapeake and PXP have improperly paid royalties to Plaintiffs." Record Document 18 at 1-2. Plaintiffs, HBM Interests, L.L.C., and Lucien Harry Marioneaux Jr., oppose the motion. (Record Document 31). For the reasons that follow, the Defendants' Motion for Partial Summary Judgment (Record Document 18) is hereby **DENIED**.

**BACKGROUND**

On January 22, 2008, Plaintiffs HBM Interests, L.L.C., and Lucien Harry Marioneaux granted a mineral lease to Chesapeake ("the lease"), covering 1,196 acres in Section 18, Township 15 North, Range 13 West, DeSoto Parish, Louisiana. Chesapeake subsequently assigned to PXP an undivided interest in the lease. (Record

Document 17 at 4).[1] The printed lease portion of the lease was subject to an addendum listed as Exhibit A, which included the following:

> 2. The royalties to be paid by Lessee to Lessor in all instances and upon all substances herein leased are "twenty-five percent" (25%) of said substances and the royalties provided for in the printed form are hereby amended to read "twentyfive percent" (25%) in place of one-eighth. The royalties to be paid to Lessor are subject to the following provisions:
>
> ...
>
>> (b) **The royalty to be paid the Lessor on gas, casinghead gas, and gaseous substances shall be the market value at the wellhead** for said gas, casinghead gas, and gaseous substances produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom. Notwithstanding anything contained to the contrary in the previous sentence, Lessee shall not sell any gas, casinghead gas, or gaseous substances of Lessor at a price that is less than the price the Lessee receives for the sale of its gas produced in the field and **Lessee shall make every effort to sell the gas, casinghead gas, or gaseous substances of Lessor at the best price available in the field where produced.** The price received by Lessee for the sale of its gas in an arms-length transaction with a third party (one who is not a Subsidiary or Affiliate of Lessee) in which Lessee receives no other consideration shall be conclusively presumed to be the best price available in the field.
>>
>> (c) As a condition of Lessor entering into this lease with Lessee, **Lessee in computing Lessor's royalty shall not deduct the cost of treating, gathering, dehydrating, compressing, extracting, processing, manufacturing, transporting, or marketing (except actual charges paid by Lessee in arms-length transactions with unrelated and unaffiliated third parties for delivering the product to market)**....

Record Document 31-2, *emphasis added*.

---

[1] The record does not indicate the exact percentage.

A portion of the lands covered by the Chesapeake Lease is included within the geographic boundary of the HA RA SU101 unit of the Caspiana Field, created by Order No. 191-H-41 of the Louisiana Office of Conservation. This unit, known as the "Reeves Well," is operated by Exco Operating Company, LP[2] ("Exco") pursuant to an operating agreement between Chesapeake and Exco. This reciprocal operating agreement between Chesapeake and Exco, the full extent of which is unclear at this time, is paramount to the resolution of this dispute and is discussed at length below. However, it is uncontroverted that after selling the gas produced from this well, Exco deducts post-production costs attributable to its subsidiary, TGGT, before remitting payment to Chesapeake and PXP. Chesapeake and PXP then pay royalties based on this net payment from Exco, essentially passing through a portion of the post-production costs to Plaintiffs. Both the sale of gas and a majority of the charges deducted from Plaintiffs' royalty share stem from Exco's business dealings with TGGT.

In summary, for each month of production on the Reeves well, Exco reports to Defendants the amount of gas produced, the price received, severance taxes due, and deductions made for post-production costs. Both Chesapeake and PXP pass on to Plaintiffs a portion of these "post-production" costs attributable to TGGT; albeit indirectly on the part of Chesapeake. Chesapeake does not report to Plaintiffs the gross sale price Exco receives for the sale of its gas or the nature and amount of any post-production costs. Rather, Chesapeake reports the net price it receives after post-production costs as the "price" it received and affirmatively represents that $0.00 were deducted.

---

[2] Exco Operating Company, LP is not a party to this lawsuit.

PXP's statements sent to Plaintiffs were different. PXP reports the actual sale price received by Exco along with the post-production charges on its check stubs, but PXP then deducts an additional charge for calculating Plaintiffs' royalties. As a result of these activities, Plaintiffs brought this action in state court against the Defendants claiming that the Defendants are underpaying the lease royalty by deducting post-production costs contrary to the addendum in the mineral lease. Defendants removed the matter on diversity grounds and subsequently filed this Motion for Partial Summary Judgment. See Record Document 18.

## SUMMARY JUDGMENT

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id (citations omitted). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and

---

[3]The Court notes that the amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and advisory committee's note (emphasis added). This Court considers this change to be a distinction without a difference.

designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994); Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also, S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When the nonmovant has the burden of proof at trial, he "must come forward with evidence which would be sufficient to enable it to survive a motion for directed verdict at trial." Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996). If the nonmovant can not meet this burden, then "the motion for summary judgment must be granted." Id., Little, 37 F.3d at 1076.

## LAW AND ANALYSIS

"The Lease contract is the law between the parties, defining their respective legal rights and obligations...as well as the rules for interpretation of contracts as laid down in

the Civil Code." Frey v. Amoco Prod. Co., 603 So. 2d 166, 172 (La. 1992)(citations omitted).

> The purpose of interpretation is to determine the common intent of the parties. See La.Civ.Code art. 2045. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter, see La.Civ.Code art. 2047, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. See La.Civ.Code art. 2048. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. La.Civ.Code art. 2053. When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. La.Civ.Code art. 2054.

Id. Most importantly, however, "[w]here the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." Tammariello Properties, Inc. v. Med. Realty Co., Inc., 549 So. 2d 1259, 1263 (La. App. 3d Cir. 1989). Such is the case in the present dispute. The addendum, labeled as Exhibit A, which by its very terms prevails over any conflict between the printed lease form and the exhibit, clearly and unambiguously set forth the exact manner in which the Defendants can deduct certain post-production costs.

Accordingly, the heart of this dispute revolves around Paragraphs 2(b) and (c)[4] of the addendum.[5] While the Defendants have laid out a comprehensive, treatise-like brief covering Louisiana jurisprudence as it relates to "market value at the wellhead" and "post-production" costs, this focus is premature. It is undisputed that if there is a conflict between the provisions of the body of the lease (in which the paragraph, the "royalty clause" appears) and the addendum, the addendum controls. Regardless of any dispute as to the exact meaning of post-production cost under the technical term of art "market value at the wellhead," the addendum specifically dictates that the Lessee [Defendants] cannot deduct the cost of treating, gathering, dehydrating, compressing, extracting, processing, manufacturing, transporting, or marketing *unless these were actual charges paid by the Lessee in an arm's-length transaction with unrelated and*

---

[4]The Plaintiffs accuse the Defendants of prejudicially labeling Paragraph 2(c) of the addendum the "affiliate" clause while then engaging in the same practice and referring to the clause as the "no-cost royalty clause." Paragraph 2(c) does, in fact, allow for certain costs to be deducted if it falls under a specific exception, one of the requirements being that the charge was actually paid to an *unrelated* and *unaffiliated* third party.

[5]It should be noted that in deciding this motion, the Court specifically rejects the argument made by the Plaintiffs that because Paragraph 2(b) requires the lessee to pay royalties based on the "best price available in the field," all deductions from this "best price" are improper. Record Document 31-1 at 4. To do so would nullify Paragraph 2(c) which allows the Defendants to deduct nine types of post-production costs when computing Plaintiffs' royalty provided that certain conditions are met. Plaintiffs also argue that the lease "sets the market value as the 'price received by the lessee, **period**.'" Record Document 31 at 9, *emphasis added*. This position is not based on the text of Paragraph 2(b) which states that the "price received by the lessee...shall be conclusively presumed to be the best price available in the field" without directly stating whether this "price" is a starting point or an ending point. While the royalty is based on the best price available in the field, the Court finds that this can only be interpreted as a starting point when considering the whole addendum, which allows the Defendants to deduct specific post-production costs. Additionally, Paragraph 2(b) lays out part of the process of arriving at the market value at the wellhead by mandating that the Defendants shall make every effort to sell the gas...at the best price available in the field where produced. It does not state that the market value at the wellhead is, in fact, the initial sale price received, as implied by the Plaintiff.

*unaffiliated third parties for delivering the product to market.*[6] This clause clearly allows the deduction of certain post-production costs so long as they fall under the described exception. Therefore, the resolution of this motion actually hinges on whether Defendants' deductions made from Plaintiffs' royalty share were charges paid in an arm's-length transaction with unrelated and unaffiliated third parties for the purpose of treating, gathering, dehydrating, compressing, extracting, processing, manufacturing, transporting, or marketing natural gas to deliver the product to market.

At first glance, it appears that this issue has an easy resolution. There is no dispute that Exco is not an "affiliate" of either Chesapeake or PXP insofar as they have no substantive overlapping or shared ownership interests. However, upon further review of the unique facts at issue, the existing reciprocal well-operating arrangements between Exco and Chesapeake cast grave doubt about whether Exco qualifies as a true arm's-length third-party operator under the terms of the subject lease.

The record at this stage clearly demonstrates that Chesapeake and Exco have entered into reciprocal contractual operating agreements in which Chesapeake operates a portion of Exco's wells and *vice versa*. In doing so, both Exco and Chesapeake operate each other's wells in which they do not have an interest in the

---

[6]The plain language of paragraph 2(c) of the addendum does not prohibit the deduction of all "post-production" costs *per se.* Rather, it places restrictions on the deduction of nine specific types of costs. The addendum specifically mandates that the Lessee shall not deduct the cost of treating, gathering, dehydrating, compressing, extracting, processing, manufacturing, transporting, or marketing except in certain circumstances. Should the Defendants deduct costs from the Plaintiffs' royalty payment which fall outside of the specific enumerated costs listed in the addendum [i.e. treating, gathering, marketing, etc.], the Court must then continue its analysis to determine if these costs can be deducted pursuant to some other provision in the lease.

lease, ostensibly allowing them to sidestep any lease restrictions which apply only to the holder, such as a provision restricting the deduction of costs unless they were actually paid by Lessee in arms-length transactions with unrelated and unaffiliated third parties for delivering the product to market. There is no dispute that, if Exco was the holder of the lease at issue, they could not deduct costs attributable to TGGT before paying the royalties due Plaintiffs. While reciprocal operating agreements may be permissible (given the fact that the lessee and lessor's interest are usually aligned and both parties are motivated to get the maximum sale price while minimizing post-production costs since traditionally both parties pay a percentage of such costs), deducting post-production costs made by the lessee's related or affiliated party alter this alignment, potentially allowing the lessee to shift a higher proportion of the post-productions costs onto the lessor landowner. Here, Plaintiffs allege that the interests of the mineral lessee are distorted through the *quid pro quo* operating practices between Chesapeake and Exco/TGGT.

Plaintiffs have presented evidence that these two companies may, in fact, be considered "related" based on their reciprocal operating agreements. Furthermore, irrespective of any relation or affiliation, the Plaintiffs have presented evidence calling into doubt whether the charges paid by the lessee were made through true arm's-length transactions. See Record Document 31, fn 45.

Plaintiffs contend that under the Chesapeake-Exco reciprocal operating agreement, Chesapeake has no motivation to engage in vigorous arm's-length negotiations with a well operator as it relates to post-production costs, as a portion of

these inflated costs can be passed on and charged to the Lessor. Any economic damages that potentially result from Chesapeake paying the above market post-production charges appear to be offset by Chesapeake charging back these costs to Exco. An example of this practice can be found in the 3% marketing premium listed as a post-production cost by Chesapeake and routinely deducted from Plaintiffs' royalties. Plaintiffs have provided evidence that Chesapeake charges Exco a 3% premium, which Exco in turn charges back to Chesapeake on wells operated by Exco; Chesapeake then deducts a portion of this charge from Plaintiffs' royalty payment. On the evidence presented, this type of transaction falls squarely within the self-dealing behavior prohibited by Paragraph 2(c) of the addendum. Accordingly, there remains a question of fact as to whether the arrangements between Chesapeake and Exco qualify them as unrelated and unaffiliated third parties engaging in true arm's-length transactions within the terms of the addendum.[7]

Additionally, even assuming that Chesapeake and Exco were in fact totally unrelated, unaffiliated third parties under the lease despite their reciprocal operating agreements, there also remains a genuine dispute as to whether the charges deducted from Plaintiffs' royalties were made to "deliver the product to market." While Exco charged Chesapeake a 3% marketing premium, this premium was not charged to PXP, raising considerable doubt as to whether this charge was necessary to bring produced natural gas to market.

---

[7]This issue can only be resolved through thorough discovery to untangle the exact nature of the relationship between Chesapeake and Exco, including practices that may alter the interests of either party such as charge backs, penalties, or premiums.

Finally, there remains a dispute over the exact nature of the charges that may fall outside the scope of the affiliation restriction found in the addendum. One such cost is the accounting charge deducted by PXP from Plaintiffs' royalties. It is conceivable that other language in the contract may allow for the deduction of post-production costs attributable to a related party so long as they fall outside the nine enumerated post-production costs listed in the addendum.[8] Should it be determined the Defendants deducted post-production costs which were not incurred for the purpose of treating, gathering, dehydrating, compressing, extracting, processing, manufacturing, transporting, or marketing to deliver the product to market, the exact nature of such charges must be factually resolved before this Court can rule as to whether other parts of the lease allow such deductions.

## CONCLUSION

The Court finds that there remains a genuine dispute as to whether Chesapeake and PXP are improperly charging Plaintiffs' royalty share a portion of post-production costs. The addendum to the lease clearly and unambiguously restricts the Defendants from deducting certain costs unless these were actual charges paid by the Lessee in arm's-length transactions with unrelated and unaffiliated third parties for delivering the product to market. Plaintiffs have provided sufficient rebuttal evidence at this stage to support their allegation that Chesapeake failed to engage in true arm's-length transactions with an unrelated and unaffiliated third party to deliver the product to

---

[8] See footnote 4. The plain language of paragraph 2c of the addendum does not prohibit the deduction of all "post-production" costs *per se.* Rather, it places restrictions on the deduction of nine specific types of costs.

market. Furthermore, there remains a factual dispute as the exact nature of certain charges deducted from Plaintiffs' royalty share and whether such charges either fall under the nine enumerated in the addendum or, in the alternative, are allowable per another clause in the contract.

Accordingly,

**IT IS ORDERED** that the Defendants' Motion for Partial Summary Judgment (Record Document 18) be and is hereby **DENIED**. An Order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in chambers, Shreveport, Louisiana on this 28th day of March, 2013.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE